**Julian McLAUGHLIN, Plaintiff, by his next friend Julia McLAUGHLIN,**

v.

**Robert B. WILLIAMS, Secretary of the Florida Department of Health and Rehabilitative Services, Defendant.**

**No. 92–0551–CIV.**

United States District Court, S.D. Florida.

April 2, 1992.

634

William Kimble, Ft. Worth, Tex., for plaintiff.

Karel Baarslag, Sr. Atty., Tallahassee, Fla., for defendant.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

MARCUS, District Judge.

THIS CAUSE comes before the Court upon Plaintiff's Motion for Preliminary Injunction. Having reviewed the pleadings, the applicable law, and having taken evidence and argument at the preliminary injunction hearing held March 27, 1992, we hold, for the reasons detailed below, that Plaintiff is entitled to the preliminary relief he seeks and a preliminary injunction should properly issue.

This case involves the tragic situation of the Plaintiff, Julian McLaughlin, a twelve-month-old baby who suffers from terminal liver disease, and whose death in the next year is highly likely, if not a virtual certainty, if he does not receive the liver-small bowel transplant he requires. Time is of the essence. The availability of a donor is largely a matter of fortuity, and Plaintiff can deteriorate rapidly to an inoperable condition. The Defendant, Robert B. Williams, is Secretary of the Florida Department of Health and Rehabilitative Services ("HRS"), which as a matter of policy refuses to fund under Medicaid the type of transplant required.

On March 10, 1992, Plaintiff filed a Complaint alleging a deprivation of Plaintiff's constitutional and statutory rights and requesting that the Court compel HRS to pay for the transplant. Specifically, Plaintiff seeks the following: (1) a declaratory judgment that the transplant coverage policies of the Department of Health and Rehabilitative Services violates the Federal Medicaid statute, 42 U.S.C. § 1396, *et seq.;* (2) a temporary restraining order and a preliminary injunction requiring the Defendant to give the University of Pittsburgh Medical Center the financial guarantee it requires in order to place Plaintiff on its active transplant waiting list; (3) a permanent injunction requiring the Defendant to furnish liver/bowel transplant services to Plaintiff, including pre-transplant diagnostic services and all medically necessary post-transplant services; (4) an award of court costs and, pursuant to 42 U.S.C. § 1988, attorney's fees; and (5) all such other relief that the Court deems appropriate. Because of the exigency presented by the Complaint, the Court set the matter for status conference the following day, on March 11.

At the status conference counsel for both Plaintiff and Defendant addressed the most expeditious method for considering Plaintiff's motions. The parties agreed that due to the substantial possibility of a rapid deterioration in Plaintiff's health, a temporary restraining order should issue immediately to ensure that the search for a suitable donor would be commenced, discovery should be expedited, and a hearing

on the motion for preliminary injunction should proceed forthwith. The parties agreed to entry of the following Order:

THIS CAUSE came before the Court on March 11, 1992 on Plaintiff's Motion for Temporary Restraining Order. Counsel for both plaintiff and defendant were present. With the consent and agreement of the parties in all regards, and upon the observation that under Rule 65 of the Rules of Civil Procedure a temporary restraining order must by its terms expire within ten (10) days of the date of its entry, but may be extended if the party against whom it is entered consents, it is hereby,

ORDERED that the application for a temporary restraining order is GRANT-ED and that Defendant is ordered to give the University of Pittsburgh a financial guaranty it requires to place the Plaintiff on the active transplant waiting list; and

ORDERED that no bond is required of Plaintiff; and

ORDERED that Defendant's Motion for Preliminary Injunction shall be heard before the undersigned at the United States Courthouse, 301 North Miami Avenue, Fifth Floor, Miami, Florida on Friday, March 27 at 10:00 a.m.

Temporary Restraining Order (Mar. 11, 1992). The date selected for the preliminary injunction hearing, as well as all other aspects of the order, were specifically agreed upon by counsel for both parties. It was recognized that while a fuller record would be desirable, time was of the essence, and a preliminary injunction hearing should proceed on March 27.

By the instant motion, Plaintiff preliminarily seeks to compel the Defendant to maintain the financial guaranty that the State of Florida will pay for the operation during the pendency of the instant litigation; without such a guaranty, the hospital cannot commence its search for a donor. A fact hearing was held by the Court on March 27, and the parties were directed to submit proposed findings of fact and conclusions of law no later than March 31, 1992. Despite the accelerated discovery,

the evidence presented at the preliminary injunction hearing was incomplete. Dr. Jorge Reyes, an Assistant Professor at the University of Pittsburgh, and a liver-small bowel transplant surgeon who is among the leading figures in the field, testified for the Plaintiff as both a fact and expert witness. Dr. Donald Novak, a Pediatric Gastroenterologist who is an Assistant Professor at the College of Medicine at the University of Florida, and Dr. John Sullenberger, a thoracic and cardiac surgeon who is a medical consultant to Florida Medicaid, testified as experts for the Defendant. In addition, Tanya Williams, Program Administrator for the Institutional Services Policy Unit for HRS, testified for the Defendant. Additional depositions of Dr. Andres, a pediatric gastroenterologist hepatologist, and Dr. Flores, Plaintiff's treating gastroenterologist, were received in evidence.

Dr. Reyes' testimony as to the Plaintiff's condition was uncontroverted, and was substantially corroborated by Dr. Novak's limited testimony on the subject. Due to a malformation in the closing of the abdominal wall, known as gastroschisis, part of the Plaintiff's intestine died and the entire small bowel and part of the large bowel were removed. As a result of the diminished intestine, Plaintiff can only utilize calories received through total parenteral nutrition, ("TPN") a form of intravenous feeding. This dependency on TPN for all nutrition, combined with the diminished intestine, is a condition known as "short-gut" syndrome. In Plaintiff's case, the constant hyperalimentation resulted in liver damage, which began to manifest itself when Plaintiff was two months old; apparently, liver damage resulting from the constant intake of TPN is common in patients with short-gut syndrome. At present, the Plaintiff is jaundiced and has a large, hard liver and a hard spleen; in addition he is developing other signs of liver disease. The damage to the liver is irreversible.

Dr. Reyes testified unequivocally that he recommended a liver-small bowel transplant[1], and that without the transplant, in

1. The liver-bowel transplant is not to be con-    fused with an isolated liver transplant, which is

his expert medical opinion, Plaintiff will die of liver disease within one year at most. Dr. Reyes also testified that it would not be unexpected if Plaintiff "died tomorrow," because in Plaintiff's current state he is extremely susceptible to a fatal infection. Plaintiff, in Dr. Reyes opinion, is a "sitting duck." Dr. Reyes testified, however, that Plaintiff is an excellent candidate for a transplant, and that he believes that with the operation, Plaintiff "would be a healthy child."

It is undisputed that Defendant as a matter of policy deems liver-small bowel transplants experimental and refuses to fund them through Medicaid. The only transplants currently considered nonexperimental are those for kidneys, liver and bone marrow, and for heart transplants in patients more than one year of age. *See* Defendant's Exhibit 4 at 1.

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3). *See Alacare, Inc.–North v. Baggiano,* 785 F.2d 963, 967–70 (11th Cir.), *cert. denied,* 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986); *Pinneke v. Preisser,* 623 F.2d 546, 548 (8th Cir.1980). Defendant has raised no jurisdictional objection to these proceedings. Indeed, both sides agreed, for purposes of this application for preliminary relief, that the central question is whether the procedure is truly experimental in nature.

It is by now clear that the moving party in an action seeking preliminary injunctive relief pursuant to Fed.R.Civ.P. 65 bears the burden of establishing four criteria: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury in the absence of injunctive relief; (3) a balance of hardships favoring the movant; and (4) the advancement of some discernible public interest by entering injunctive relief. *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974). *See also Guaranty Finan-*

*cial Services, Inc. v. Ryan,* 928 F.2d 994, 997–98 (11th Cir.1991). "In order to prevail plaintiff must carry the burden on all four elements." *Spiegel v. City of Houston,* 636 F.2d 997, 1001 (5th Cir.1981).

The main dispute here has concerned Plaintiff's likelihood of success on the merits. The federal statute commonly known as Medicaid, Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.,* is a cooperative state-federal program which helps fund medical aid for those who otherwise could not meet the cost. "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Florida has elected to participate.

The Medicaid statute specifies seven services a state plan must provide to qualified individuals.[2] *See* 42 U.S.C. § 1396a(a)(10)(A) ("A state plan for medical assistance must ... provide for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a) of this title...."). Included among these mandatory services are inpatient hospital services, various outpatient services, and laboratory and X-ray services. *See* 42 U.S.C. § 1396d(a)(1)–(3).

Furthermore, the state plan must "include reasonable standards ... for determining eligibility for and the extent of medical assistance under the plan which (A) are consistent with the objectives of this subchapter...." 42 U.S.C. 1396a(a)(17). This language prompted the Supreme Court in *Beal v. Doe,* a case holding that Medicaid did not require state funding of nontherapeutic abortions, to make the following observation:

Pennsylvania's regulation comports fully with Title XIX's broad objective to en-

---

covered by Florida Medicaid. The difficulty in this case occurs because of recent developments in medical technology which now enable transplant of the bowel as well. When a liver-small bowel transplant is performed, the organs must come from the same donor.

**2.** The State has not disputed that Plaintiff is a qualified individual to whom these services must be provided pursuant to a plan.

able each State, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services. Although serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the Act for a State to refuse to fund *unnecessary*—though perhaps desirable—medical services.

432 U.S. 438, 444, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977). Relying on this language from *Beal*, various lower courts have held that a state plan must fund the mandatory services enumerated in § 1396d(a) whenever they are found to be "medically necessary." *See, e.g., Pinneke,* 623 F.2d at 548 n. 2; *Montoya v. Johnston,* 654 F.Supp. 511, 512–13 (W.D.Tex.1987); *Lee v. Page,* No. 86–1081–CIV–J–14 (M.D.Fla. Dec. 19, 1986).

*Rush v. Parham,* 625 F.2d 1150 (5th Cir.1980), which is binding precedent upon this court, *see Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), contains a thorough explication of these issues.[3] In *Rush,* the Plaintiff sued to obtain Medicaid funding for transsexual surgery. The district court on summary judgment held that under the federal medicaid statute and the Supreme Court's ruling in *Beal v. Doe,* the state program must pay for all services deemed medically necessary by the patient's physician. *Rush,* 625 F.2d at 1154. The former Fifth Circuit reversed and wrote as follows:

The district court's holding that a state must pay for all treatment found by a doctor to be medically necessary comprises two separate conclusions: first, that a state Medicaid program must provide all medically necessary services; and second, that the private physician is the sole arbiter of medical necessity. We find it unnecessary to determine the correctness of the first conclusion, for the grounds on which the state seeks to justify its refusal to pay for the surgery, *i.e.,* that it was experimental and not indicated for this plaintiff, are fully consonant with a requirement that all medically necessary services be funded....

The district court has, in effect, held that a state has no role in determining whether a particular service is medically necessary. In our view, however, the Medicaid statutes and regulations permit a state to define medical necessity in a way tailored to the requirements of its own Medicaid program.

*Id.* at 1155. The Court of Appeals held that "a state may adopt a definition of

---

**3.** In *Rush* the former Fifth Circuit observed with respect to *Beal*'s dicta:

The basis for finding that a state program must pay for all medically necessary services is that the appropriation section of the Medicaid statute states that the purpose of the Medicaid program is to enable each state

[T]o furnish ... medical assistance on behalf of [certain] families ... and ... individuals, whose income and resources are insufficient to meet the cost of *necessary medical services.* 42 U.S.C. § 1396.

*Rush,* 625 F.2d at 1155 n. 9. (all brackets, ellipses and emphasis in *Rush* ). The Court observed that several courts have held that the quoted statutory language "only identifies the group that is to be served by Medicaid, and was not intended to specify the extent of coverage." *Id.* (citing *Preterm Inc. v. Dukakis,* 591 F.2d 121 (1st Cir.1979)). The Court thus reasoned that "it may be that a state Medicaid plan *can* limit coverage of medically necessary services, but only if the limitation is necessary to a state interest that is permissible under the Medicaid statutory scheme...." *Rush,* 625 F.2d at 1155.

The federal Medicaid statute does make "necessary" medical treatment a substantive provision considering the extent of coverage for infants such as Julian in the "early and periodic screening, diagnostic, and treatment" ("EPSDT") portions of the statute. *See* 42 U.S.C. § 1396d(a)(4)(B) (mandating that the state plan provide EPSDT services "for individuals who are eligible under the plan and are under the age of 21"); 42 U.S.C. § 1396d(r)(5) (defining EPSDT services to include "[s]uch other necessary health care ... to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, *whether or not such services are covered under the state plan.*") *See infra* note 10 (West Virginia considers funding of liver-bowel transplant to be required under EPSDT).

Moreover, Defendant has argued only that the liver-bowel transplant at issue is experimental and therefore not medically necessary; no argument has been advanced, nor any evidence proffered, that denial of coverage is "necessary to a state interest."

medical necessity that places reasonable limits on a physician's discretion" and upheld as reasonable the state's refusal to pay for "experimental" treatment. *Id.* at 1154–55. The appellate court remanded the cause to the district court to determine if in fact the state had established a policy of refusing to fund experimental surgery, and, if it did, whether its determination that the transsexual surgery at issue was reasonable. *Id.* at 1156–57. The Court stressed that the district court's determination was to be based on current medical opinion. *Id.* at 1157 n. 13. As the Defendant has undisputedly established a policy of refusing to fund experimental surgery, and has undisputedly deemed liver-bowel surgery experimental, the issue before us is whether such a determination was reasonable.

The former Fifth Circuit in *Rush* explicated a definition of experimental:[4]

> The clearest articulation of the considerations that go into determining whether a particular service is experimental is found in a letter Medicare uses to explain to its clients and providers why such a service is ineligible for reimbursement:
>
> > In making such a decision [whether to provide payment for a particular service], a basic consideration is whether the service has come to be generally accepted by the professional medical community as an effective and proven treatment for the condition for which it is being used. If it is, Medicare may make payment. *On the other hand, if the service is not generally accepted, is rarely used, novel or relatively unknown, then authoritative evidence must be obtained that it is safe and effective before Medicaid may make payment.*

*Id.* at 1156 n. 11 (emphasis added) (brackets in original). *See Montoya,* 654 F.Supp. at 513 (relying upon *Rush* definition of experimental); *Lee v. Page,* No. 86–1081 CIV–J–14 (M.D.Fla. Dec. 19, 1986) (same). It is against this rubric that we enter our findings of fact and conclusions of law. Based on the limited record before us, Plaintiff has sufficiently shown authoritative evidence that the liver-bowel transplant is safe and effective, that the definition of "experimental" adopted by the Defendant, to the extent one has been adopted, is not clear, if ascertainable at all, and that Plaintiff is likely to succeed on the merits.

Dr. Reyes testified that to him an experiment occurs when one performs a procedure, despite unknown factors, in order to test a hypothesis concerning those unknown factors. Insofar as human rights protocols are concerned, Dr. Reyes testified, the transplant has been deemed non-experimental. He also testified that though he would not deem the liver-intestine operation experimental, others surely would. He added that the operation is clearly "efficacious." He testified that a term like "experimental" generally arises in the context of Medicaid and Medicare coverage, and is not truly a medical term. Dr. Reyes further testified that he would also consider the extensive prior medical experience with liver transplants, and the large experience with transplantation of significant isolated portions of the intestine, specifically, the duodenum transplant that accompanies pancreatic transplants. Dr. Novak, called by the defense, testified that he would consider such factors as the number of times a procedure was performed, the success rate of the procedure over the years, both in terms of morbidity and enhancement of quality of life, and the appearance of unintended effects over the years. Dr. Sullenberger, in turn, stressed that a treatment must be deemed experimental until its effectiveness is proved over a sufficiently lengthy period of time, although how long is hard to define, and until it can be done universally with uniform, acceptable mortality rates. The Defendant did not, however, provide any guidance as to how much time must pass, or how generally accepted a practice must be in order to justify removing the "experimental" label. In sum, the basic disagree-

---

**4.** The Court expressly termed this a "detailed definition of experimental surgery." *Rush,* 625 F.2d at 1155 n. 8.

ment over the definition of "experimental" only confirms that no simple demarcation is possible.

Defendant and its expert witnesses, one of whom is a consultant to Medicaid, have concluded that unless a fixed period of time had passed, and until a practice was generally accepted in the medical community, a procedure must be deemed experimental. In *Rush*, however, the Court suggested a test for whether a treatment is experimental that explicitly differentiated between "rarely used, novel or relatively unknown" treatments and those generally accepted by the medical community. 625 F.2d at 1156 n. 11. Under the test the Court suggested, it is explicit that "rarely used, novel or relatively unknown" treatments can be found medically necessary if "authoritative evidence" shows the treatment "safe and effective." *Id.*

Inasmuch as the safety of a new procedure is an important issue to be considered, one commentator has observed as follows:

A technology or its particular use is considered unsafe, and therefore perhaps wasteful, when its risks exceed the benefits to the patient. Risk of harm is defined in terms of the probability and severity of harm. Therefore, if the probability and the severity of harm from a technology are greater than the probability and the magnitude of the benefits it purports to provide, the technology is unsafe. A surgical procedure would clearly be unsafe, for example, if it had a 50% probability of killing the patient but only a 10% chance of correcting a condition that created a 25% probability of the patient's death.

Safety is a relative concept. A safe technology has a low risk (probability times severity of harm) compared with its potential benefits (probability times magnitude). As a result the greater the potential benefits of a technology, the greater the risk that might be acceptable for the technology to be deemed safe.

Mehlman, *The Legal Implications of Health Care Cost Containment: A Symposium: Health Care Cost Containment and Medical Technology: A Critique of Waste Theory*, 36 Case W.Res.L.Rev. 778, 785 (1986).

To determine whether a relatively new procedure is effective, we believe that the following factors, among others, must be considered: (1) the mortality of patients over the period in which the procedure has been performed; (2) how often the procedure has been performed, where it has been performed, and the success or failure of the procedure; (3) the reputation of the medical centers and doctors who are performing the new procedure, and their record in related areas; (4) the long term prognosis of the patients who have had the procedure performed on them and lessons that can be derived from related procedures; and (5) to what extent medical science in that and related areas has developed rapidly.

This list, of course, is not exclusive. But we are compelled to establish some framework that can be used to measure the efficacy of new procedures. The Defendant's contention, stated simply, is that as a matter of law, until a given amount of time, albeit unspecified, has passed, and until the new procedure is accepted generally, the procedure must be deemed experimental, and the state need not pay. On the record before us, this view appears to be both too narrow and too imprecise, and it ignores the rapid rate of advancement of medical science in the field of transplants.

The definitional difficulties are compounded, as Defendants were able to offer no manageable standard regarding the length of time a procedure must achieve positive results before it may be deemed non-experimental. Dr. Sullenberger's testimony is illustrative. Though he insisted that the two-year period over which Pittsburgh has achieved its results is insufficient, he conceded that an additional year of impressive results might be sufficient. Yet the doctor could offer no explanation as to why two years was insufficient, but three years might be enough, and could offer no factors that would guide his determination.

Similarly, Dr. Sullenberger's insistence on nationwide replication with uniform

mortality does not resolve the issue. No evidence was presented as to why the availability of the treatment nationwide is relevant; in fact, the testimony showed that the intestinal transplants are not needed with such frequency that it would make sense to have them performed at every local hospital. The procedure is unlikely to be duplicated beyond a relatively small number of university medical centers. Moreover, Dr. Sullenberger was not able to establish what number of locales would be sufficient, or what factors would inform a determination of a sufficient number. He did however conclude that the establishment of six centers that do liver-bowel transplants was insufficient. Of course, only thirteen hospitals nationwide have been approved by Medicare to do liver only transplants, *see* Plaintiff's Exhibit 3, despite the acknowledgement by Defendant's experts that liver transplants have been regarded as non-experimental since, at latest, the mid–1980s.

Acceptance in the medical community, too, cannot be singularly dispositive in a case such as this one. The procedure at issue is highly specialized, and the testimony showed that advances in this type of transplant, and transplants generally, have arrived at a rapid rate. In fact, though all of the expert witnesses claimed to be well informed as to the successes of bowel transplants, only Dr. Reyes, the evidence showed, was truly fluent with the results. The testimony revealed that this disparity in knowledge results in part from the significant time lag, often well over a year, between the occurrence of an event and the publishing of a report in the medical press.

We do not suggest that acceptance in the medical community or a proven track record over several years are not very important factors in the calculus. And it is only with the greatest hesitation that we preliminarily substitute our judgment for that of HRS; great deference to the administrators of a state medicaid plan is due and the federal courts are rarely well-suited to make delicate determinations such as these. However, on this limited and preliminary record, and though the proof is incomplete, we find a reasoned probability that Plaintiff will succeed in establishing that the state's policy of refusing to fund liver/small bowel transplants is unreasonable. The facts before us indicate that a liver-bowel transplant cannot, on this record, properly be deemed "experimental."

Plaintiff seeks to have her transplant performed at the Children's Hospital of Pittsburgh, a teaching hospital affiliated with the University of Pittsburgh (collectively, "Pittsburgh"). The testimony from both Dr. Reyes and Defendant's expert witness Dr. Novak establishes that Pittsburgh is the preeminent liver transplant hospital in the world, performing 1–3 each day, and approximately 400 each year. *See also* Deposition of Dr. Joel Andres at 38 ("They are the people at the forefront of transplantation."). The testimony went so far as to establish that a doctor at Pittsburgh, Dr. Starzl, is largely responsible for developing the liver transplant procedure. Doctors nationwide come to Pittsburgh to train in performing liver transplants, including Dr. Bud Shaw, who is currently the head of a successful liver transplant center in Omaha, Nebraska.

The evidence indicates that of patients who undergo liver transplants, about 90% survive more than one year, and about 80% survive five years or more, at which point the mortality rate levels off. All three experts agreed that such figures clearly render the liver transplant non-experimental, although it had originally been termed experimental. The testimony revealed that the greatest hurdle to overcome in a liver transplant is rejection of the liver by the donee's immune system, and that acute rejection usually occurs in the first year of the transplant, which accounts for the sharp drop in mortality after one year. The expert testimony also showed that the advent of cyclosporin, an immunosuppressant, in the early 1980s, was largely responsible for making liver transplants viable, and hence non-experimental, in that it helped to overcome rejection of the transplanted organ. *See also* Deposition of Dr. Joel M. Andres at 22.

Pittsburgh is similarly at the forefront of the ongoing revolution in liver-intestine

transplants and isolated intestine transplants. Pittsburgh has performed more than any other medical center, and Dr. Reyes is one of three doctors there who regularly performs the operations. The endeavor first began in the 1960s and extensive laboratory tests and experiments with hundreds of animals took place prior to the first attempts on humans. The Pittsburgh program utilizing the techniques currently in use is about two years old. A variety of other medical centers have begun to perform the intestine and liver-intestine transplants, including UCLA, Cedar–Sinai, Omaha–Nebraska, London (Ontario),[5] a center in Philadelphia, and Baylor.

In that two year period, seventeen patients at Pittsburgh received transplants of either the liver and small bowel or the small bowel alone. *See* Plaintiff's Exhibit 10.[6] Of the seventeen, nine were children and eight were adults, with ages ranging from six months to fifty years old. Of the seventeen, one has died, and that was 23 days after the transplant. Another patient, who required a new intestine as a result of a gunshot wound, did not take his post-operation medicine as ordered, and required a retransplant from chronic rejection. In all, sixteen out of seventeen have survived. Omitting the two patients who had transplants most recently, fourteen out of fifteen have survived, a ninety-three percent success rate. Defendant's expert Dr. Novak indicated that in his opinion, Pittsburgh's short term results are excellent. Indeed, Dr. Novak added that with liver transplants alone, a success rate between 80% and 90% is considered very good. He opined that the Pittsburgh results "are tremendous and very promising." Defendant's other expert, Dr. Sullenberger, likewise acknowledged that this rate is certainly an acceptable mortality rate; and though he indicated that he believed it too soon to term the operation non-experimental, he indicated that in another year with similar results, the non-experimental classification might be appropriate. Dr. Reyes testified that he expects that twenty liver/small bowel transplants will be performed in the next year, and, in his expert medical opinion, he expects no change in the survival rate.[7]

All of the survivors receive nutrition orally, and no longer need TPN. Of the two school age children, one attends school and one is tutored at home. Only the patients who have had recent transplants, and two others having follow-up biopsies, are hospitalized at this time.

Dr. Reyes attributed the success rate to a variety of factors, including the prior experience with liver transplants, controlled immunosuppression, technical refinements in the "hookup" of the transplanted organ, improved perioperative care, and careful patient selection. No single factor is as significant as the development of FK506, a relatively new immunosuppressant that is more effective than cyclosporin. This drug has been in use for three years and is currently being used in clinical trials[8] at a dozen medical centers in the United States, and still more in Europe.

---

5. London (Ontario) is apparently a pioneer in this field as well, having performed eight intestinal transplants. Dr. Grant at this center was among the first doctors to work with intestinal transplants.

6. One patient, Patrick Burgess, received a multivisceral transplant.

7. Dr. Andres, in his deposition, indicated that he believes intestinal transplants to be experimental. Deposition of Dr. Joel Andres at 23. We observe, however, that Dr. Andres did not seem to be aware of the recent use of FK506. *See id.* at 25. Indeed, during Plaintiff's examination of Dr. Andres, it became clear that the deponent was not aware of the recent success rate. *See id.* at 35–36. In fact, Dr. Andres testified that he was surprised that "if Dr. Starzl and his group with [sic] done this with 14 patients, for this not to have gotten to the medical community would be most unusual." *Id.* at 35. Dr. Andres indicated that if the patients were in their communities after "two or three or four months, that's fine."

8. The Defendant places great weight upon the fact that both the intestinal transplant and FK506 are in "clinical trials." While such designation certainly connotes a lack of general acceptance in the medical community, it is not dispositive of the issue before us. Indeed, Dr. Reyes testified that bone marrow transplants, which the Defendant deems non-experimental and will fund through its Medicaid plan, are still in clinical trial stage.

About 3500 patients world-wide, most of them transplant patients, have been on FK506. The testimony indicated that because FK506 is one hundred times more potent than cyclosporin, which was a catalyst of the revolution in liver transplants, less of the drug must be used. Apparently, the new drug keeps the host from rejecting the transplant without over-immunosuppressing, which can leave the patient vulnerable to an opportunistic infection. In addition, FK506 is so potent that doctors may reduce the duration and dosage of steroid treatments from that required with cyclosporin; as a result the dangers of mixing the steroids and the immunosuppressant, which Dr. Reyes termed a "cocktail," is reduced.

Defendant's expert Dr. Novak stated that the development of FK506 is to bowel transplants as cyclosporin was to liver transplants in the 1980s. He felt the drug was a good drug, and that results on his patients who have been treated with FK506 at Pittsburgh were good. Both Dr. Novak and Dr. Reyes agreed that the efficacy of the immunosuppressants available is largely the key to the success of transplants generally, and of the liver-small intestine transplant, specifically.[9]

In sum, Plaintiff's expert Dr. Reyes testified that the procedure is "efficacious," and he produced Pittsburgh's success rate in support. Defendant's experts agreed that the short-term results are indeed very impressive, and that if these results continued, the procedure would undoubtedly become generally accepted in the medical community. Furthermore, Dr. Novak testified that if he were Plaintiff's physician he would encourage Plaintiff to have the transplant.

Finally, we quote from a letter submitted as Plaintiff's Exhibit 2, from Robert M. Goldstein, M.D., who is the Assistant Director of Transplantation Services in the Department of Surgery at the Baylor University Medical Center in Dallas.[10] Notably, Dr. Goldstein opined:

> It is without question that in a very short period of time, *the field of small bowel transplantation has advanced from the stages of experimental to clinically applicable.* The results for small bowel transplantation, especially when combined with liver transplantations, is remarkable and these patients now have a chance for full rehabilitation. The improvements in this field are primarily related to an understanding of immunosuppression and the rejection processes as well as advances in new drug therapy.

Plaintiff's Exhibit 2 (emphasis added).

Based on the limited record before us, we are persuaded that the term "experimental" is difficult to define precisely. When a

---

**9.** This is not to suggest that use of FK506 is risk free. Dr. Reyes testified that neurotoxicity, which can result in symptoms ranging from nightmares to comas, may result. In addition, renal dysfunction is also a possibility. Overimmunosuppression is also a risk. Dr. Reyes testified, however, that all use of cyclosporin incurs these risks as well, and that in his experience, all three of these problems occur less frequently with FK506 than cyclosporin.

**10.** We admit Plaintiff's Exhibit 2 into evidence over Defendant's objection. *See Marshall Durbin Farms, Inc. v. National Farmers Org., Inc.,* 446 F.2d 353, 357 (5th Cir.1971) ("While we do not rule out the possibility that hearsay may form the basis for, or contribute to, the issuance of a preliminary injunction, the district courts have shown appropriate reluctance to issue such orders where the moving party substantiates his side of a factual dispute on information and belief.") In Plaintiff's Exhibit 2, a medical doctor at an institution recognized by Defendant's expert as a leading transplant center expressed his view as to the nonexperimental status of intestinal transplants. Though Defendant did not have a chance to cross-examine the declarant, the objection is not foundational. In no way can we find, as the former Fifth Circuit did in *Marshall Durbin,* that the evidence adduced in support of the complaint is not based on personal knowledge. Moreover, Dr. Goldstein's statement is cumulative, supporting the statement of Dr. Reyes. "Affidavits and other hearsay materials are often received in preliminary injunction proceedings. The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate, given the character and objectives of the injunctive proceeding." *Asseo v. Pan American Grain Co.,* 805 F.2d 23, 26 (1st Cir.1986). In the instant matter, we conclude that admission of the evidence, giving due weight to the fact that Defendant did not have the opportunity to confront the declarant, and the need for expedition, is appropriate.

relatively new therapy is at issue, one that has demonstrably saved human lives, and has a ninety-three percent success rate over the period of its use, here some two years, the fact that the procedure has not existed some unspecified, but nonetheless mandatory period of time, cannot be dispositive. *See Rush*, 625 F.2d at 1156 n. 11. Moreover, when a medical center acknowledged as among the leading transplant centers in the world, and the leading center in this field, fully supports the program, and has a success at a rate so rapid that even doctors such as Dr. Novak, Dr. Andres and Dr. Sullenberger are unfamiliar with their successes, despite keeping up with the medical literature,[11] we do not believe that attainment of some unspecified medical acceptance of the procedure is a necessary prerequisite. After considering the standards discussed earlier, namely (1) the mortality of patients over the period in which the procedure has been performed, (2) how often the procedure has been performed, where it has been performed, and the success of the procedure, (3) the reputation of the medical centers and doctors who are performing the procedure and their record in related areas, (4) the long term prognosis of the patients who have had the procedure performed on them and lessons that can be derived from related procedures, and (5) to what extent medical science in that and related areas has developed rapidly, we conclude that Plaintiff has demonstrated a substantial likelihood of success on the merits.

Defendant has raised as an alternative legal theory that *Rush* does not contain the appropriate standard of review, and that this court should apply *Ellis v. Patterson*, 859 F.2d 52, 55 (8th Cir.1988), an Eighth Circuit case in which the Court held that despite the general rule that medically necessary services must be covered, a state may choose which types of transplants to fund, without regard to medical necessity. The Eighth Circuit based its conclusion on two excerpts from the House Report concerning the requirements established for federal funding of state coverage for organ transplants. *See id.* (citing H.R.Rep. No. 100–391(I), p. 532, *reprinted in* 1987 U.S.Code Cong. & Admin.News at 2313–1, 2313–352; H.R.Conf.Rep. No. 100–495, p. 756, *reprinted in* 1987 U.S.Code Cong. & Admin.News at 2313–1245, 2313–1502).

We observe that *Ellis* is not binding precedent, and that *Rush* controls. If Congress wished to limit *Rush*, certainly it could have done so explicitly. We note, moreover, that in *Ellis* the Court did not have before it a Plaintiff claiming to be included under the EPSDT provisions of the medicaid statute and regulations, which explicitly requires that "necessary" medical care be provided. *See supra* note 3; 42 U.S.C. § 1396d(a)(4)(B); 42 U.S.C. § 1396d(r)(5).[12] In addition, though the Court characterizes its conclusion as a

---

**11.** In fact, Dr. Reyes has published extensively in the medical literature concerning this procedure. *See, e.g.,* Reyes, et al., *Liver and Small Bowel Transplantation for Short Gut Syndrome in a Child*, Transplantation Science, 1:27–33 (1991); Reyes, et al., *Cadaveric Small Bowel and Small Bowel–Liver Transplantation in Humans*, Transplantation, (February, 1992); Reyes, et al., *Temporary End-to-Side Portocaval Shunt in Orthotopic Liver Transplantation*, Surg.Gynecol.Obstet. (in press); Reyes, et al., *Clinical Small Bowel or Small Bowel Plus Liver Transplantation Under FK 506*, Transplant Proc., 23:3093–3095 (1991); Reyes, et al., *Functional Analysis of Graft Lamina Propria Associated Lymphocytes from a Recipient of a Human Cadaveric Small Bowel Allograft Primarily Immunosuppressed by FK 506*, Transplant Proc., 23:2943–2944 (1991); Reyes, et al., *Intravenous, Oral Pharmacokinetics and Oral Dosing of FK 506 in Small Bowel Transplant Patients*, Transplant Proc. (in press); Reyes, et al., *Histologic*

*Monitoring of Human Small Bowel Allografts with Clinical Correlation*, Transplant Proc. (in press); Reyes, et al., *Lymphocyte Trafficking Using In Situ Hybridization and Physioanatomy of the Intestinal Immune System After Human Small Bowel Transplantation*, Transplant Proc. (in press); Reyes, et al., *Serum Levels of Interleukin-6, Tumor Necrosis Factor-[a] and Interleukin-2 in Rejecting Human Small Bowel Allografts*, Transplant Proc. (in press).

**12.** *See also* Plaintiff's Exhibit 5, a letter from John L. Marks, Jr., Director of the Office of Medical Services of the West Virginia Department of Health and Human Resources, who states that West Virginia believes it is compelled to pay for liver-small bowel transplants pursuant to the EPSDT regulations and will pay for these transplants for children under the age of 21. This exhibit is received over Defendant's objection. *See supra* note 8.

holding, it may be deemed dicta, as the transplant in question was in fact covered by Medicaid by the time the issue reached the Court of Appeals. *See Ellis*, 859 F.2d at 56.

Defendant also observes that on remand following the Fifth Circuit's ruling in *Rush*, see *Rush v. Johnson*, 565 F.Supp. 856, 864 (N.D.Ga.1983), the district court found a rational basis for the state's deeming transsexual surgery experimental, and emphasized that approximately six thousand people had undergone that surgery. The district court, however, did not base its determination upon an insufficient number of operations. Rather, the court found substantial disagreement in the medical community as to whether the surgery was safe, as serious complications from surgery often resulted and the Plaintiff's condition was not terminal, and as to whether other forms of treatment produced better results. In contrast, in the instant case, no record evidence belies Dr. Reyes' tremendous success rate, no alternative procedure has been suggested, and no dispute exists that the Plaintiff will die without the operation. In sum, on this preliminary record, we think Plaintiff has established a likelihood of success on the merits.

The irreparable harm prong has undoubtedly been satisfied by Plaintiff. The testimony establishes that Plaintiff will die without the transplant, and that the search for a donor cannot commence unless the State is compelled to provide the financial guaranty required by the hospital.

The balance of the equities also tilts decidedly in Plaintiff's favor. Defendant's monetary risk is substantial; however, Plaintiff's life is at stake. "Undoubtedly the harm to the plaintiff would have been enormous, indeed fatal were the injunction denied, and the harm to the Commonwealth if granted, while it may not have been negligible, was measured only in money and was inconsequential by comparison." *Todd v. Sorrell*, 841 F.2d 87, 88 (4th Cir. 1988). Similarly, we believe the public interest is served by compelling the state to take the steps necessary to ensure that the search for the required organ can com-

mence. Surely, given the strong possibility that the state has erred in refusing payment, it is in the public interest to ensure that full resolution on the merits is possible, and that Plaintiff's claim is not rendered moot by his death.

Accordingly, Plaintiff's motion for *preliminary* injunction is GRANTED. Defendant is hereby ORDERED to provide to the University of Pittsburgh the financial guaranty required. It is furthermore ORDERED that an authorized representative of HRS submit to this Court within seven (7) calendar days of the date of this order an affidavit certifying that (1) the required financial guaranty has been made; and (2) that the University of Pittsburgh has accepted the financial guaranty.

The Clerk of this Court is directed to notify counsel for both parties, and the Secretary of the Florida Department of Health and Rehabilitative Services forthwith of this ORDER.

DONE AND ORDERED.