Heidi PETERSON on Behalf of Markelle FREI–PETERSON, Petitioner,

v.

UTAH DEPARTMENT OF HEALTH, DIVISION OF HEALTH CARE FINANCING, Respondent.

No. 981078–CA.

Court of Appeals of Utah.

Nov. 27, 1998.

Michael E. Bulson, Ogden, and W. Paul Wharton, Salt Lake City, for petitioner.

Jan Graham and Jean P. Hendricksen, Salt Lake City, for respondent.

Before BENCH, GREENWOOD and JACKSON, JJ.

OPINION

GREENWOOD, Judge:

Heidi Peterson, mother of Markelle Frei–Peterson (Markelle), petitions for review of a Final Agency Order of the Department of Health, Division of Health Care Financing (DHCF), which denied Medicaid coverage for treatment of Markelle's short bowel syndrome with human growth hormone, as recommended by Markelle's treating physician. We affirm the Agency Order.

BACKGROUND

Two-year-old Markelle has short bowel syndrome,[1] and, as a result, relies on total parenteral nutrition (TPN), a form of intravenous feeding, for almost all her nutritional needs. Her treating physician, Dr. William D. Jackson, was concerned with Markelle's liver condition because her liver tests in June 1997 showed "marked abnormalities." Dr. Jackson proposed to treat Markelle by using humatrope, a growth hormone that, according to Dr. Jackson, "stimulates transcription of certain regulatory genes that turn on growth of the lining of the intestine" and, hopefully, increases the patient's ability to absorb nutrients. Medicaid currently covers the use of humatrope for the purpose of treating short-statured children; however, the use of humatrope to treat short bowel syndrome is an off-label use of the hormone.

In 1997, Primary Children's Medical Center charitable funds financed three months of Markelle's treatment with the growth hormone. Markelle's mother testified at the hearing that since taking the hormone, Markelle's oral nutritional intake had improved. Dr. Jackson also testified that Markelle's liver abnormalities had stabilized, but conceded that this stabilization actually occurred prior to and independent of the treatment with humatrope.

Dr. Jackson recommended treating Markelle with the growth hormone for one year; however, Primary Children's Medical Center would not continue financing the cost of the growth hormone treatment. Thus, Markelle requested that DHCF approve Medicaid payment for use of the growth hormone to treat her short bowel syndrome.

On July 16, 1997, DHCF's Drug Utilization Review Board (Review Board), a committee comprised of physicians, pharmacists, and other medical professionals, denied the request. The Review Board based its denial on the fact that the documentation Markelle submitted "indicated [this suggested use of humatrope] was an experimental procedure." The decision was made pursuant to Utah Administrative Code, Rule 414–10–5(4), which states: "Experimental or medically unproven physician services or procedures are excluded from coverage ." Utah Code Admin.P. R414–10–5(4).[2]

1. According to the articles submitted to DHCF by Markelle's treating physician, this disorder results from "extensive loss or dysfunction of the intestinal absorptive surface area" and is characterized by "dehydration, electrolyte disturbances, malabsorption [of nutrients], and progressive malnutrition." *See* Theresa A. Byrne et al., *Growth Hormone, Glutamine, and a Modified Diet Enhance Nutrient Absorption in Patients With Severe Short Bowel Syndrome*, J. of Parenteral and Enteral Nutrition, July–August 1995, at 296, 296. "The severity of the disorder depends upon the length, location, and absorptive function of the remaining bowel and its ability to accommodate the reduced absorptive surface area." *Id.*

2. According to testimony by the State's doctor, the following Utah Off–Label Drug Use Policy, admitted as an exhibit at the hearing, was consulted when the Review Board considered whether to approve Markelle's request:

*Off–Label Drug Use Policy* November 13, 1997.

Utah restricts the covered drug products on the open formulary to uses approved and documented by the officially recognized compendia [OBRA 1993, section 1927(d)(6) ]. The designated compendia are:
1. Package insert, FDA approved uses
2. American Hospital Formulary Service Drug Information (AHFS)
3. American Medical Association Drug Evaluation (AMADE)
4. United States Pharmacopeia Drug Information (USP–DI)
5. DRUGDEX
The [Drug Use Review Board] may approve an unlisted off-labeled use for a given drug if the off-labeled use meets the following criteria:
1. Use must be diagnosis-specific as defined by an ICD9 code(s).
2. Off-labeled use must be supported by one major multi-site study or three smaller studies published in JAMA, NEJM, Lancet or specialty peer review medical journals such as Journal

Markelle requested a hearing before an administrative law judge. At the hearing, Dr. Jackson testified to the medical necessity of the treatment. Dr. Jackson stated that although potential liver damage was of great concern, his primary reason for recommending the humatrope treatment for Markelle was to increase nutrient absorption in the bowel and enable Markelle to tolerate increased oral feedings.

In support of her request, Markelle submitted four articles about the use of humatrope to treat short bowel syndrome. This literature discussed the symptoms of short bowel syndrome and traditional methods of treatment, and detailed a new treatment that involves dietary changes and administration of both glutamine and the humatrope growth hormone. All four articles discussed the same four-week, single-site study, and were authored by the same individuals. The articles were published in specialty publications, and at least one was subjected to peer review. However, none of the articles appeared in a major publication. Additionally, the study was neither performed at multiple sites nor did it occur over long-term. Thus, neither the articles nor the study discussed appear to come within the Utah Off-Label Drug Use Policy criteria for demonstrating that the Review Board may approve the treatment.

At the hearing, the Administrative Law Judge (ALJ) questioned Dr. Jackson about the growth hormone's efficacy in preventing liver dysfunction. Dr. Jackson admitted that the hormone only did so "indirectly." He further stated that

these studies are not large, they're not the kind of studies in which someone would say on a blanket case that ... you will do this for everybody. But for certain indications there's enough promise there to motivate a number of different people to continue to work along these lines. . . . And there's—there is controversy.

Dr. Jackson further testified:

I can admit up front that the indications are not in your code for using it this way. The area ... does have controversy as with any new therapy, and there is a possibility that this could be disproved. And there have been other times when medicine has gone down the wrong path and [doctors] thought they ... had a therapy that was helpful but it turned out not to be true.

The ALJ found that although Markelle had begun to tolerate some oral feedings, she was nonetheless primarily dependent on parenteral nutrition, and that "[b]ecause she has short bowel syndrome, Markelle is at risk of central line catheter infections, eventual loss of intravenous access sites, and progressive liver dysfunction."

The findings further stated that use of growth hormone for short bowel syndrome is considered an off-label use by the Food and Drug Administration. The ALJ noted that although "[t]he data is sufficient to motivate a number of reputable physicians to prescribe growth hormone for short bowel syndrome," this use "is still considered to be controversial."

The ALJ's recommended conclusion of law stated: "The use of growth hormone to treat small bowel syndrome is 'experimental' as defined in: Utah Administrative Code R414–1A–200,[3] and is therefore not covered by Utah Medicaid [see R414–1A–300(1) ]."

The ALJ's Recommended Decision stated that although Dr. Jackson "made compelling arguments for the medical necessity of using growth hormone for Markelle," his testimony indicated that Markelle's improvement "could have come from the maturation process and

of Cardiology. Articles must be current—within five years.
3. Off-labeled use must have a defined dosage regimen.
4. Off-labeled use must have a defined duration of treatment.
5. The off-labeled use shows clear and significant clinical or economic advantage over existing approved drug regimens.

3. We note that all references in this opinion are to the 1996 Utah Administrative Code. Although the 1997 revision of the Administrative Code was in effect at the time of the hearing, the ALJ relied upon the 1996 version. With the exception of minor renumbering changes, the 1996 version is substantially the same as the 1997 version and affects neither the ALJ's reasoning nor our analysis thereof.

the oral feedings Markelle has recently begun to tolerate."

The ALJ also noted Dr. Jackson's testimony indicated that the use of growth hormone for short bowel syndrome is still controversial. Thus, Dr. Jackson's testimony was "not able to overcome DHCF's evidence that the use of growth hormone to treat short bowel syndrome is an off-label usage of the drug, and it has not yet been proven to be effective for that usage." Because Dr. Jackson's testimony clearly indicated that the use of growth hormone to treat short bowel syndrome was not "widely utilized as a standard medical practice," the ALJ held this use "therefore meets the criteria for an 'experimental procedure.' " The ALJ accordingly recommended that DHCF's action be upheld.

DHCF issued a Final Agency Order adopting the ALJ's Recommended Decision in its entirety. Markelle appeals.

## ISSUE

The sole issue we are asked to determine on appeal is whether DHCF erred in determining that the treatment of Markelle's short bowel syndrome with humatrope was an experimental use of the hormone under the Utah Medicaid guidelines.

## ARGUMENTS

Markelle argues DHCF erred in denying approval of payment for growth hormone treatment. Markelle asserts that the ALJ applied an overly restrictive definition of experimental, that the evidence presented by Dr. Jackson's testimony and the medical literature are both authoritative and substantial in establishing that the growth hormone treatment is safe and effective, and that Dr. Jackson's opinions are entitled to controlling weight in determining whether the treatment is medically necessary. Markelle argues DHCF's decision was not supported by substantial evidence, and asks that we reverse the order denying Medicaid coverage for the growth hormone.

DHCF counters that the ALJ's decision was proper because the use of the growth hormone proposed by Markelle's physician is experimental under Utah's definitions and

under Medicaid law. Therefore, argues DHCF, Utah law does not permit coverage for this experimental treatment. DHCF argues that because the practice is not proven to be medically effective, it is not a medical necessity, and the division's determination was a proper exercise of its discretion.

## STANDARD OF REVIEW

Our review of this case requires the application of statutes and administrative rules to a specific factual situation. An "agency's application of the law to the facts may, depending on the issue, be reviewed ... 'with varying degrees of strictness, falling anywhere between a review for "correctness" and a broad "abuse of discretion" standard.' " *Drake v. Industrial Comm'n*, 939 P.2d 177, 181 (Utah 1997) (citation omitted). Additionally, appellate courts should "take[ ] into account factors such as policy concerns and an agency's expertise." *Id.* at 181 n. 6.

■ Here, the determination that the requested hormone use is experimental is a conclusion of law. Nevertheless, the determination in this case is highly fact-dependent. We will not disturb an agency's factual findings if they are supported by substantial evidence in the record as a whole. *See id.* at 181. In addition, we note that application of the federal Medicaid statutes and the relevant rules and regulations is within the legislative grant of discretion to DHCF. *See, e.g.,* Utah Code Ann. § 26–18–3(1) (1995) ("The department shall be the single state agency responsible for the administration of the Medicaid program."); *id* . § 26–18–2.3 (1995) (stating DHCF is responsible for economical administration of Medicaid, for establishing safeguards to prevent unnecessary or inappropriate use of Medicaid, and for denying claims for services that "fail to meet criteria established by the division"). In addition, DHCF's twelve-member Review Board is authorized to ensure that Medicaid-approved drugs are "appropriate, medically necessary, and not likely to result in adverse medical outcomes." *Id.* § 26–18–107(1) (1995). *See generally id.* §§ 26–18–102, –103, –107 (1995). Thus, given the medical complexity of the issue involved, we believe some mea-

sure of discretion is owed to DHCF's decision, after its consideration of the Review Board's recommendations and the definitions DHCF has adopted. Nonetheless, "[w]hile we are therefore disposed to give heightened deference to the [agency], policy considerations compel us to exercise some scrutiny." *Drake,* 939 P.2d at 182.

## DISCUSSION

"Title III of the Social Security Act, 42 U.S.C. § 1396, et. seq., [or Medicaid,] is a cooperative state-federal program which helps fund medical aid for those who otherwise could not meet the cost." *McLaughlin v. Williams,* 801 F.Supp. 633, 636 (S.D.Fla. 1992). "The federal government reimburses states electing to participate in the Medicaid program for a percentage of the funds they expend in providing medical care for eligible individuals and families." *A.M.L. v. Department of Health,* 863 P.2d 44, 47 (Utah Ct. App.1993) (citing *Allen v. Utah Dep't of Health,* 829 P.2d 122, 124 (Utah Ct.App. 1992)). Title XIX of the Social Security Act governs state plans for medical assistance under Medicaid. *See* 42 U.S.C. § 1396a et. seq. Once a state has elected to participate, "it must comply with the requirements of Title XIX." *McLaughlin,* 801 F.Supp. at 636 (citation omitted). Thus, "[a]lthough Title XIX does not require States to provide funding for all medical treatment ..., it does require that state Medicaid plans establish 'reasonable standards ... for determining ... the extent of medical assistance under the plan which ... are consistent with the objectives of [Title XIX].' " *Beal v. Doe,* 432 U.S. 438, 441, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) (citation omitted). Participating states are granted "considerable latitude in creating and implementing their Medicaid programs." *A.M.L.,* 863 P.2d at 47. The United States Supreme Court has explained that Title XIX's "broadly stated primary objective [is] to enable each State, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services." *Beal,* 432 U.S. at 444, 97 S.Ct. 2366 (citation omitted).

The Medicaid statute identifies seven services a state plan must provide to qualified individuals. *See* 42 U.S.C. § 1396a(a)(10)(A) (state plan for medical assistance must "provide for making medical assistance available, including at least the care and services listed [in certain paragraphs] of section 1396d(a) of this title."). "Included among these mandatory services are inpatient hospital services, various outpatient services, and laboratory and X-ray services." *McLaughlin,* 801 F.Supp. at 636 (citation omitted).

Relying on language found in *Beal,* "various lower courts have held that a state plan must fund the mandatory services enumerated in section 1396d(a) whenever they are found to be 'medically necessary.' " *McLaughlin,* 801 F.Supp. at 637 (citations omitted). However, in *Rush v. Parham,* 625 F.2d 1150 (5th Cir.1980), where a plaintiff sought Medicaid funding of his transsexual surgery, the Fifth Circuit reversed the district court's ruling that a state program must pay for all services deemed "medically necessary" by the patient's physician:

> The district court's holding that a state must pay for all treatment found by a doctor to be medically necessary comprises two separate conclusions: first, that a state Medicaid program must provide all medically necessary services; and second, that the private physician is the sole arbiter of medical necessity. We find it unnecessary to determine the correctness of the first conclusion, *for the grounds on which the state seeks to justify its refusal to pay for the surgery, i.e., that it was experimental and not indicated for this plaintiff, are fully consonant with a requirement that all medically necessary services be funded.*

*Id.* at 1155 (emphasis added).

The Fifth Circuit therefore held in *Rush* that "a state may adopt a definition of medical necessity that places reasonable limits on a physician's discretion" in determining what treatments are "medically necessary" and that one such reasonable limit is "a ban against reimbursement for experimental forms of treatment, i.e., treatment *not generally recognized as effective by the medical profession.*" *Id.* at 1154–55 (emphasis added). The *Rush* court further stated that

"[t]his does not remove from the private physician the primary responsibility of determining what treatment should be made available to his patients ... only that the physician is required to operate within such reasonable limitations as the state may impose." *Id.* at 1156.

In conformance with Title XIX and under the authority of Utah Code Ann. § 26–18–3(2) (1995), DHCF has established standards for administering the Medicaid program in Utah. Included in those standards is a policy of refusing to fund experimental medical treatments. Utah Administrative Rule 414–1A–300 provides:

(1) Experimental or unproven medical practices are not covered Medicaid services.

...

(3) Procedures or services proven to be medically efficacious for specific medical conditions may be provided as covered Medicaid services only for the conditions specified. Such procedures or services are not covered for any other conditions or for experimental trials.

Rule 414–1A–200 further defines "experimental or unproven medical practice" and "medically efficacious" as follows:

(a) "experimental or unproven medical practice" means any procedure, medication product, or service that is:

(i) not proven to be medically efficacious for a given procedure; or

(ii) performed for or in support of purposes of research, experimentation, or testing of new processes or products; or

(iii) both

(b) "medically efficacious" means a medical practice that:

(i) has been determined effective and is widely utilized as a standard medical practice for specific conditions; and

(ii) has been approved as a covered Medicaid service by division staff and physician consultants on the basis of medical necessity, as defined in R414–13x–1(5)(a) and in accordance with R414–26–1(2)(f) ....

*Id.* R414–1A–200. Lastly, "medically necessary" is defined as follows:

(a) A service is "medically necessary" if it is (1) reasonably calculated to prevent, diagnose, or cure conditions in the recipient that endanger life, cause suffering or pain, cause physical deformity or malfunction, or threaten to cause a handicap; and (2) there is no other equally effective course of treatment available or suitable for the recipient requesting the service which is more conservative or substantially less costly.

*Id.* R414–13x–1(5)(a).

■ Therefore, Utah has complied with the federal Medicaid statutes by reasonably limiting coverage for medically necessary treatment to those which are not experimental, as defined in Utah's regulations. Consistent with those regulations and case law, DHCF is not required to accord controlling weight, as Markelle urges, to a treating physician's opinion or recommendation on the issue of whether a particular treatment is experimental and thus not covered by Medicaid.

■ In *Rush,* the Fifth Circuit approved a test for determining whether a treatment is "experimental." 625 F.2d at 1156. The test differentiates between treatment not "generally accepted by the professional medical community as an effective and proven treatment for the condition" and treatment that is "rarely used, novel or relatively unknown...." *Id.* at 1156 n. 11. *See also Miller v. Whitburn,* 10 F.3d 1315, 1320 (7th Cir.1993) (relying on *Rush* definition of experimental and stating, "[c]learly, the best indicator that a procedure is experimental is its rejection by the professional medical community as an unproven treatment."); *Montoya v. Johnston,* 654 F.Supp. 511, 513 (W.D.Texas 1987) (same). This description of "experimental" is substantially identical to that in the Utah Administrative Rules. Thus, applying the test suggested in *Rush,* we conclude that "rarely used, novel or relatively unknown" treatments may be found medically necessary if "authoritative evidence" shows the treatment to be "effective" for a given medical condition. *See Miller,* 10 F.3d at 1320 (holding "certain procedures [which are so new that they are relatively

unknown] are not *per se* experimental. If 'authoritative evidence' exists that attests to a procedure's safety and effectiveness, it is not 'experimental.' ").

■ A review of the evidence in the case before us indicates that it was equivocal, at best. For example, at the hearing, Dr. Jackson provided ambivalent testimony as to the humatrope treatment's effectiveness:

[After administering growth hormone for three months and noting Markelle's new ability to take food orally, Dr. Jackson noted that the improvement] could just be a maturity process, it could just be that she's gradually been able to ... adapt from the feedings or could be ... due to [the use of the growth hormone].

Dr. Jackson also stated that although Markelle seemed to have made some progress since humatrope treatment began, "that does not prove anything." He further admitted that he did not "think there's anything [about Markelle's treatment that] you could write an article about or it'd be a very dubious case report." Thus, Dr. Jackson's testimony, even in combination with the articles submitted to DHCF, does not constitute "authoritative" evidence that the new treatment is "medically efficacious" under the Code's definition. The evidence also indicated that the current treatment used to treat Markelle's condition—TPN—is more conservative than the humatrope treatment and is effective to some degree; for example, Dr. Jackson indicated he could not assure that the growth hormone alone was responsible for Markelle's new ability to take some nutrition orally rather than parenterally. Moreover, Dr. Jackson admitted that Markelle's liver test abnormalities had normalized *before* the three-month administration of the growth hormone; thus, it was not clear that the growth hormone was helping prevent liver damage.

Dr. Jackson's testimony also indicated that the treatment is, in effect, "rarely used, novel or relatively unknown," or, in other words, not "generally accepted by the professional medical community as an effective and proven treatment for the condition." *See Rush*, 625 F.2d at 1156 n. 11. Dr. Jackson's testimony as to the treatment's experimental nature was as follows:

I think ... if you think of it in terms of data being accumulated and evaluating the efficacy, the appropriate dosage, the appropriate indications, things like that. And this one particularly as early a therapy as this is, as young a therapy I guess as this is would definitely ... have to be considered.... I consider it more of a situation of taking a therapy that's been— that is in use, that is new, that is not 100 percent validated and may very well have certain subjects, certain patients in which it works in and certain patients that it doesn't.

Markelle contends the ALJ's finding that the treatment was experimental was based on an overly restrictive definition of the word experimental. However, her reliance on *McLaughlin v. Williams*, 801 F.Supp. 633 (S.D.Fla.1992) and *Weaver v. Reagen*, 886 F.2d 194 (8th Cir.1989), is misplaced.

In *McLaughlin*, a twelve-month-old infant sought Medicaid coverage of a liver-small bowel transplant which had been deemed experimental by the Florida Department of Health and Rehabilitative Services. Significant testimony and evidence was presented which indicated the procedure was effective and was performed regularly in several locations and thus was "generally accepted by the medical community." Additionally, the success rate for the procedure was impressive, the doctor scheduled to perform the procedure was one of the foremost experts in the field and the facility was world-renowned for such procedures, there was literally no alternative procedure, and there was no dispute that the boy would die without the operation. *See McLaughlin*, 801 F.Supp. at 642–45.

Markelle's case can be distinguished from *McLaughlin* in that there was no significant evidence presented that the treatment would be effective or that it is used in more than a few locations in the world. Further, no evidence was presented as to the treatment's success rate, and the evidence did not indicate that Markelle was at certain risk of death if she did not receive the growth hormone.

In *Weaver*, the Eighth Circuit considered whether the drug AZT was an experimental treatment for AIDS patients. The court held that the FDA had announced its approval of AZT for the treatment of AIDS, and cited evidence that "physicians commonly prescribe[d] AZT for patients" who did not fall within Missouri's diagnostic criteria. 886 F.2d at 199. Additionally, the court noted evidence of widely disseminated information in "professional literature, conferences, and contacts with other physicians" which indicated AZT's acceptance in the medical community. *See id.* Thus, the court held the prescription of AZT "beyond its labeled indications" was not experimental but was instead an "effective and proven treatment for AIDS patients" who fell outside the FDA on-label use indications. *See id.* at 199–200. In contrast, no such wide acceptance, use, or understanding of the growth hormone exists in Markelle's case.

On the contrary, as the State's witness, Dr. John Hylen, indicated, DHCF was concerned that the evidence appeared to reinforce the fact that the hormone treatment is at this point still experimental:

> [O]ne of the things that concerns me is that this is an area where the Drug Utilization Review Committee[,] by federal law[,] has been set up to have controls over off-label use. And so ... it's *important* that they be involved in any decision that would open this up.... I have concern that [the ALJ is] going to approve the use of this drug in this case since [her] judgment has to be not only based on the findings of this case but also [on] a review of the literature. And I think Dr. Jackson has testified that growth hormone for this use could be disproved, which to me sounds like ... it hasn't been proven yet that it's effective in preventing liver disease and preventing the need for liver transplants.

In addition, as previously noted, the literature submitted to the ALJ was insufficient to establish that the proposed humatrope treatment is not experimental. Thus, substantial evidence on the record supported the ALJ's finding that the treatment was not yet prov-

en to be medically efficacious or generally accepted by the medical community and, therefore, was experimental. Accordingly, DHCF was within its discretion in denying Medicaid coverage for the humatrope hormone treatment.

## CONCLUSION

The record before the ALJ did not demonstrate the humatrope hormone treatment to be "widely utilized as a standard medical practice." Rather, substantial evidence supported the ALJ's determination that the requested use was experimental. Thus, DHCF was within its discretion in denying payment for the off-labeled use of the hormone. We accordingly affirm.

JACKSON, J., concurs.

BENCH, Judge (concurring in the result):

The main opinion holds that "DHCF was within its discretion in denying Medicaid coverage for the humatrope hormone treatment." When the legislature grants discretion to an agency to apply the law to the facts, as in this case, our standard of review has historically been to evaluate the agency's decision for reasonableness and rationality. *See, e.g., Morton Int'l, Inc. v. Auditing Div.,* 814 P.2d 581, 587 (Utah 1991); *Caporoz v. Labor Comm'n,* 945 P.2d 141, 143 (Utah Ct. App.1997). Furthermore, we have expressly held that reasonableness is the standard we apply when reviewing DHCF's denial of Medicaid coverage. *See Doxey–Hatch Med. Ctr. v. Department of Health,* 899 P.2d 784, 785 (Utah Ct.App.1995); *South Davis Community Hosp. v. Department of Health,* 869 P.2d 979, 982 (Utah Ct.App.1994). I would therefore simply hold that DHCF's decision denying coverage in this case is "within the bounds of reasonableness and rationality." *Savage Indus., Inc. v. Utah State Tax Comm'n,* 811 P.2d 664, 667 (Utah 1991).

I recognize that a couple of recent agency cases have used "abuse of discretion" terminology. *See Drake v. Industrial Comm'n,* 939 P.2d 177 (Utah 1997); *Osman Home*

*Improvement v. Industrial Comm'n,* 958 P.2d 240 (Utah Ct.App.1998). I am not certain that the two standards are the same, but I am willing to assume they are until someone can demonstrate that they are different.

I therefore concur in the result affirming DHCF's decision.