Billings, Thomas P., J.
The plaintiff appeals the Division of Medical Assistance’s (herein, “MassHealth’s”) handling of her requests for reimbursement for two substances, curcumin and acidophilus capsules, both of which she takes on her doctors’ recommendation. Curcumin was denied on the merits; acidophilus for want of a properly documented application. Each decision was reviewed and affirmed by a hearing officer of the Office of Medicaid. The plaintiff has appealed the Hearing Officer’s decision to this Court under G.L.c. 30A, §14.
For the reasons that follow, both decisions are AFFIRMED, with a qualification as to acidophilus as set out in the Order for Judgment, below.
SUMMARY OF PRIOR PROCEEDINGS
A. The Initial Hearing and Remand
On September 24, 2004 MassHealth’s Drug Utilization Review Unit denied the plaintiffs request that she be reimbursed for acidophilus capsules, on the ground that it was not on the list of covered medications. The plaintiff took a timely appeal to the Office of Medicaid Board of Hearings.[1] This was consolidated with a second appeal that she had taken from MassHealth’s failure to act on her prior authorization request for curcumin.
The Board (through Hearing Officer Stanley Kallianidis, who was to preside over all three hearings discussed herein) held a hearing on the consolidated appeals on May 20, 2005, and issued its decision on July 28, 2005. The Hearing Officer found:
that neither substance was on MassHealth’s non-legend (i.e., over-the-counter) drug list, nor was either the subject of a MassHealth determination, one way or the other, of medical necessity;
That MassHealth denied the request for acidophilus on the ground that it is a food item and not a drug, but acknowledged at the hearing that the request should have forwarded the request to its prior *392 authorization unit (which handles reimbursement for non-drug items) for a determination of medical necessity; and
That the curcumin request was sent back to the provider because there was no drug code to process.
Noting that the fact that a product is not on the non-legend drug list does not preclude coverage under MassHealth, the Hearing Officer remanded both issues to the agency for determinations of medical necessity.[2]
B. The Curcumin Decision
MassHealth considered the plaintiffs request for reimbursement of Curcumin, and denied it on August 12, 2005. The denial letter stated: “MASSHEALTH DOES NOT PAY FOR ANY DRUG THAT IS EXPERIMENTAL, MEDICALLY UNPROVEN, OR INVESTIGA-TIONAL IN NATURE. 130 CMR 406.413(B)(7).”
The plaintiff appealed the denial, and the Hearing Officer Kallianidis held a hearing on November 14, 2005. On January 18, 2006 he issued a decision affirming the denial.
At the hearing Amy Levy, a Registered Pharmacist employed by MassHealth’s Drug Utilization Review (“DUR”) unit, testified and presented a packet of documentary materials. These included a letter from the plaintiffs allergist (Dr. Schaefer) at U. Mass. Memorial, stating that because she was “intolerant or sensitive to many conventional pharmaceuticals” but had “various medical conditions that require treatment,” he had suggested she try “non-traditional homeopathic regimens that may be tolerated better.” Dr. Schaefer noted that the plaintiff was currently under the care of Dr. Amy Rothenberg, a homeopath. Dr. Rothenberg—who practices in Connecticut (in natur-opathic medicine, not homeopathy)—-also submitted a letter which listed the conditions for which she was treating the plaintiff, and stated:
She takes Curcumin and Flax/Borage seed oil for their natural anti-inflammatory ability.
She takes Pyloricidin to address her esophogeal reflux and GERD.
She takes Acidophilus to help re-establish proper bowel flora.
She uses these natural medicines as she does not tolerate orthodox pharmaceutical products.
Also in the record were various materials submitted by the plaintiff, chiefly from the Internet, on Curcumin. One article on the Sloan-Kettering Cancer Center website discussed animal research suggesting that Curcumin has “a preventative effect against cancer,” but noted that “human data are lacking.” It also noted (in connection with cancer treatment) that Curcumin “has anti-inflammatoiy and choleretic action” which “may be due to leukotriene inhibition.”[3]
Levy testified that Curcumin is “a medically unproven substance ... It would have to be an FDA-approved preparation.” She noted that the label on the Pure Ecapsulations packaging, while stating that its Curcumin formulation was for “liver, colon and mus-culoskeletal support,” also said:
This statement has not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.
The plaintiff testified that she has used Curcumin for five years without adverse effect (in contrast to her experiences with chemical pharmaceutical products). For her, Curcumin
relieves the pain a little, not completely. I have, you know, for taking two capsules of Curcumin may help my hands, but it’s not ... it doesn’t feel like it’s enough to go through my whole body. But I’m feeling a bit of relief, but I sure wish I could feel more. But I can’t take more than the doctor orders so, you know, maybe at another time they may increase it, but this is it.
The Hearing Officer found that the plaintiff, who reported inflammation and pain all over her body, is unable to take non-steroidal inflammatory drugs due to gastroesophogeal reflux disease, ulcers, and sensitization resulting from an incident 23 years before of formaldehyde poisoning. Curcumin, prepared from the spice turmeric, is used for “dyspeptic conditions,” and “(flurther indications exist for a clear anti-inflammatory action.”[4] Since 2001 and on her physician’s advice, the plaintiff has taken the “Pure Encapsulations Curcumin 97" product. She has not experienced any side effects from it.
The Hearing Officer was, however, persuaded by the logic advanced by Levy. He noted, as she had, that neither this nor any other Curcumin product has been evaluated by the Food and Drug Administration, and that the product label states that it “is not intended to diagnose, treat, cure or prevent any disease.” Thus, he ruled, administration of Curcumin for inflammation does not fit the definition in MassHealth’s regulations of a “medically necessary” service, in that it had not been shown to be “of a quality that meets professionally recognized standards of health care, [as] substantiated by records including evidence of such medical necessity and quality.” 130 CMR 450.204(B).
C. The Acidophilus Decision.
As directed in the July 28, 2005 remand, MassH-ealth redirected the plaintiffs request internally from the Drug Utilization Review Unit to the Prior Authorization (“PA”) Unit, and so notified her physician on August 16, 2005.[5] No approval, however, was forthcoming. The plaintiff again appealed, and the Hearing Officer Kallianidis held a third hearing on February 14, 2006. The plaintiff attended, as did three MassH-ealth officials in person or by telephone (Eloise Porterfield, Director of Prior Authorization; Jennifer *393 Mackey, Registered Pharmacist; and the aforementioned Amy Levy of the DUR Unit).[6]
Ms. Levy began by reminding those present that the plaintiffs acidophilus request had initially been directed to the DUR Unit, but in error. Because acidophilus is not a drug but a nutritional supplement, the request should have gone to the PA Unit in Boston (Porterfield’s unit). Levy therefore forwarded the request to Boston in August 2005, just after the remand.
Porterfield testified that her office received the request from Levy, but that it could not process it. At Porterfield’s direction a member of her staff (Tom Korziowski) called Dr. Rebecca Spanagel’s (the plaintiffs primary care doctor’s) office on December 22, 2005 at 3:45 p.m. to outline what was needed. “Carolyn,” a nurse in the doctor’s office, called back at 3:55. Korziowski explained that nutritional supplements are considered, for authorization purposes, under the heading of durable medical equipment (“DME”), which means that the physician must write a prescription and a letter of medical necessity, but the vendor[7] must submit the request (on MassHealth’s “PA-1”) form. Korziowski also provided the names of two approved DME vendors whom Spanagel’s office might contact to do this. This process, Porterfield testified (correctly; see below), “is all governed by Regs., so it’s not as if we are making a decision that we simply won’t accept it from the physician.”
Both Levy and Porterfield testified that to the best of their knowledge, MassHealth never received the required paperwork for acidophilus; all it had was the original Drug Prior Authorization Request, signed by Spanagel and dated July 15, 2004. Porterfield closed by suggesting that the plaintiff contact her physician and explain what is needed, and gave her the address of the PA Unit (suggesting that the paperwork be sent directly to her attention).
In his decision dated April 4, 2006, the Hearing Officer credited the testimony of Levy and Porterfield. He found that Levy had, following the remand, referred the matter on August 16 to the PA Unit, which December 22 called the plaintiffs doctor’s office[8] and explained to a nurse the documents—a physician’s prescription, a physician’s letter of medical necessity, and a prior authorization form from a durable medical equipment (“DME”) provider—that needed to be submitted in connection with the prior authorization request for acidophilus. None of these documents, however, had been submitted to MassHealth.
The Hearing Officer deferred to Levy’s determination that acidophilus had to be treated as a DME, and noted that she had contacted the PA unit in August, promptly after receiving the remand order. The PA unit seemed initially to have dropped the ball—hence the unaccountable August-December delay—but when Levy resubmitted her request in December, the PA Unit “did everything humanly possible ... to help the appellant.” “Time and time again, the appellant has failed to comply with [the PA Unit’s] straightforward request” for specific supporting documentation, which is “absolutely required [by MassHealth regulations] for the processing of a request for prior authorization of DME.” The Hearing Officer had held the record open for four weeks after the hearing, but the plaintiff submitted only “accusatory letters” in lieu of documentation. He therefore felt he had “no choice” but to deny the request.
DISCUSSION
A. Standard of Review: In General
Review of the Hearing Officer’s decisions is under G.L.c. 30A, §14. The Court may overturn the agency’s decision only if it is unconstitutional; exceeds the agency’s statutory authority; is based upon an error of law; was made upon unlawful procedure; is unsupported by substantial evidence; or is arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. §14(7). The Court’s task is to
look at the record to determine if, considering the evidence as a whole, the decision of the hearing officer was arbitrary or capricious and whether the decision took into account all of the facts that fairly supported the plaintiffs claim as well as those that fairly detracted from them.
Andrews v. Division of Medical Assistance, 68 Mass.App.Ct. 228, 231 (2007).
“The party appealing an administrative decision bears the burden of demonstrating the decision’s invalidity,” Coggin v. Massachusetts Parole Bd., 42 Mass.App.Ct. 584, 587 (1997), and the burden is a substantial one.
Judicial inquiry under the substantial evidence test is limited to determination of whether, within the record developed before the administrative agency, there is such evidence as a reasonable mind might accept as adequate to support the agency’s conclusion. If there is such evidence, [the Court must] affirm the agency’s action even though [the judge] might have reached a different result if placed in the position of the agency.
Seagram Distillers Co. v. Alcoholic Beverages Control Comm’n, 401 Mass. 713, 721 (1988). Where, as here, the agency’s decision is reviewed initially in a hearing before a hearing officer (or administrative law judge), it is the hearing officer’s decision that receives judicial review. “The reviewing court is ... bound to accept the findings of fact of the . . . hearing officer, if supported by substantial evidence.” Leominster v. Stratton, 58 Mass.App.Ct. 726, 728 (2003).
B. Federalism and the Medicaid Program
The Division of Medical Assistance, as a recipient of federal funding under the Medicaid Act (Title XIX of the Social Security Act), must comply with the requirements of the Act and the implementing regulations. See Haley v. Commissioner of Public Welfare, 394 *394 Mass. 466, 467 (1985). State plans funded by the Medicaid program must meet certain bedrock requirements, and must be approved by the Secretary of Human Services. 42 U.S.C. §§1396(a) and (b).
Federal law, however, leaves much to the States in the implementation and administration of their own medical assistance programs.
Under the Medicaid program, the Federal government provides financial assistance to States participating in the program in order that they may deliver health care to needy persons. This Federal program “confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be ‘reasonable’ and ‘consistent with the objectives’ of the Act.”
Norfolk County Hospital v. Commonwealth, 25 Mass.App.Ct. 586, 587, rev. denied, 402 Mass. 1104 (1988), quoting Beal v. Doe, 432 U.S. 438, 444 (1977), and 42 U.S.C. §1396a(a)(17) (1970, Supp V). As but one example, a participating state may elect whether or not it will provide reimbursement for prescribed drugs at all, 42 U.S.C. §§1396(a)(10)(A), 1396a(a)(12), 1396a(a)(54), and 1396r-8; if it does so, however, its program must comply with federal law.
C. The Curcumin Decision
Massachusetts receives, administers, and distributes Medicaid and state medical assistance funds through the MassHealth program. It has elected to provide both prescription and over-the-counter drug benefits. By its own regulations (and as required by federal law), “(t]he MassHealth agency will not pay a provider for services that are not medically necessary.” 130 CMR 450.204.
A service is “medically necessary,” under the regulations, if “it is reasonably calculated to prevent, diagnose, prevent the worsening of, alleviate, correct, or cure conditions in the member that endanger life, cause suffering or pain, cause physical deformity or malfunction, threaten to cause or to aggravate a handicap, or result in illness or infirmity,” and there is no other service that is comparable in effect and is more conservative or less costly. 130 CMR 450.204(A). Also, “(m)edically necessary services must be of a quality that meets professionally recognized standards of health care.” 130 CMR 450.204(B).
Several sections of the Code of Massachusetts regulations specifically address the requirements for reimbursement of the cost of prescription and over-the-counter drugs.
Under 130 C.M.R. 406.412(A)(1), MassHealth will pay for prescription drugs only if they are on the MassHealth Drug List.
Section 406.411(A) provides for reimbursement of over-the-counter drugs (drugs for which no prescription is required by federal or state law) “only if the pharmacy has in its possession a prescription that meets all requirements for a legal prescription under all applicable federal and state laws and regulations.” “These drugs are sometimes referred to as non-legend drugs.” 114.3 C.M.R. 31.02.[9]
130 C.M.R. 406.13 imposes several limitations on reimbursement for prescription and over-the-counter drugs. In addition to cosmetic, cough and cold, fertility, obesity management, and sexual dysfunction drugs, MassHealth will not pay for drugs the FDA has proposed be withdrawn from the market for ineffectiveness, or “for any drug that is experimental, medically unproven, or investigational in nature." (Emphasis supplied.)
The same section, however, also provides some relief from the MassHealth Drug List.
MassHealth covers drugs that are not explicitly excluded under 130 CMR 406.413(B) . .. The MassHealth Drug List specifies the drugs that are payable under MassHealth. Any drug that does not appear on the MassHealth Drug List requires prior authorization, as set forth in 130 CMR 406.000.
The regulations do not explicitly mention FDA approval as a requirement for reimbursement. The Mass-Health Physician Manual (of which I have taken judicial notice), however, states:
The MassHealth agency pays only for prescription drugs that are approved by the U.S. Food and Drug Administration and manufactured by companies that have signed rebate agreements with the U.S. Secretary of Human Services pursuant to 42 U.S.C. 1396r-8.
Commonwealth of Massachusetts MassHealth Provider Manual Series, Physician Manual, p. 4-36 (9/15/08).
The Physician Manual, to a greater degree than the regulations, puts the MassHealth program in compliance with federal requirements for state Medicaid programs. The cited section 1396r-8 limits the definition of “covered outpatient drug” (i.e., a drug[10] that is eligible for Medicaid reimbursement) to drugs (a) which have been approved for safety and effectiveness by the FDA, or (b) which are subject to an FDA-approved new drug application, or (c) which are grandfathered under the Food, Drug and Cosmetics Act, or (d) as to which the Secretary of Human Services has determined that “there is a compelling justification for its medical need” (or has done so with respect to a substantially similar drug). 42 U.S.C. 1396r-8(k)(2). If a drug does not fall within one of these four categories, however, Medicaid does not reimburse for it.
This is not to say that Medicaid will not reimburse for off-label uses of FDA-approved drugs to treat conditions or patients not within the FDA-approved labeling. It will, provided the use is supported by one of four enumerated compendia, or by peer-reviewed medical *395 literature. 42 U.S.C. §§1396r-8(k)(6) and 1396r-8(g)(l)(B)(i) and (ii). These sections put Medicaid reimbursement policy in line with federal drug regulatory policy, which permits manufacturers to label a drug only for uses that the FDA has approved, but entrusts the decision whether to prescribe an approved drug for an off-label use to the medical judgment of the prescribing physician. See, e.g., Washington Legal Foundation v. Henney, 202 F.3d 331 (D.C.Cir. 2000); Weaver v. Reagen, 886 F.2d 194, 198 (8th Cir. 1989). For representative cases addressing Medicaid reimbursement for FDA-approved drugs prescribed for an off-label use, see Weaver, Peterson v. Utah Department of Health, 969 P.2d 1 (Utah 1998), and the very thorough and thoughtful trial court decision in Chappell v. R.I. Department of Human Services, C.A. No. PC 02-4586 (R.I.Super.Ct., Krause, J.). Off-label use, however, presupposes an FDA-approved drug; these cases are therefore inapposite here.[11]
All of this is to say that Ms. Levy, in determining that MassHealth may not reimburse for a non-grandfathered drug that has not been evaluated and approved by the FDA, had it right, as did the Hearing Officer. Curcumin, when “intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals,” is a drug, see footnote 10, supra, and therefore was non-reimbursable because it has not (so far as the administrative record shows) been evaluated and approved for any therapeutic purpose by the FDA. The Hearing Officer’s decision as to Curcumin is therefore affirmed.
D. The Acidophilus Decision
The issues surrounding the plaintiffs authorization request for acidophilus are, as Levy and Porterfield explained at the hearing, quite different from those in the Curcumin appeal.
MassHealth’s regulations contain (and the careful reader of this decision may already have suspected) a definitional anomaly. “Durable medical equipment” is defined, in 130 CMR 409.402, about as one might expect—it is
equipment that
(1) is fabricated primarily and customarily to fulfill a medical purpose;
(2) is generally not useful in the absence of illness or injuiy;
(3) can withstand repeated use over an extended period; and
(4) is appropriate for use in the member’s home.
Section 409.413, however, provides that “Covered DME includes, but is not limited to,” the following:
(1) absorbent products;
(2) ambulatory equipment, such as crutches and canes;
(3) compression devices;
(4) speech augmentative devices;
(5) enteral and parenteral nutrition;
(6) nutritional supplements;
(7) home infusion equipment and supplies (pharmacy providers with DME specialty only);
(8) glucose monitors and diabetic supplies;
(9) mobility equipment and seating systems;
(10) personal emergency response systems (PERS);
(11) ostomy supplies;
(12) support surfaces;
(13) hospital beds and accessories;
(14) patient lifts; and
(15) bath and toilet equipment and supplies (commodes, grab bars, tub benches, etc.).
(Emphasis supplied.)
Elsewhere, the regulations define “nutritional supplements” as “commercially prepared products primarily used to treat a diagnosed deficiency in the member’s diet or nutrition.” 130 CMR 409.402. Thus, the regulations appear to contemplate—and MassH-ealth appears to agree—that a substance such as acidophilus, prescribed to repopulate the enteral flora, may qualify for reimbursement as DME, even though it is neither durable, nor equipment, nor even medical in the strictest sense.
There is, however, a way that it has to be done. Under 130 CMR 409.404, reimbursement for DME “is made only to providers who are participating in Mass-Health as a DME provider,” for which it must qualify under the criteria enumerated in the rest of the section (everything from accreditations, insurance, and regular business hours, to CORI checks of its staff). The DME provider must procure from the most cost-effective source, and accept MassHealth rates. 130 CMR 409.405, 409.427. To be reimbursable, a DME product must be “medically necessary,” “approved for home use by the federal Food and Drug Administration,” no more costly than the appropriate and feasible alternatives, “of proven qualify and dependability,” and not “experimental.” 130 CMR 409.413(A), 409.414.
The DME provider must obtain prior authorization from MassHealth if it is to be paid. 130 CMR 409.418. For this to happen,
The DME provider must obtain a prescription and letter of medical necessity (LOMN) for the purchase or rental of DME. The prescription and the letter of medical necessity must be in writing, signed by the prescribing provider, and dated prior to the date the claim is submitted to the MassHealth agency. For certain DME that requires a prescription by specified medical professionals, the prescription and LOMN must be signed by such medical professionals.
130 CMR 416(A).
*396 In short: once they straightened out the issue of which unit was to receive and process it, the MassHealth personnel who handled the plaintiff’s acidophilus request did what the governing regulations required of them. The Hearing Officer accepted the testimony to this effect as credible. It is clear that in some respects at least, the plaintiff doubted it.[12] Under the substantial evidence test, however, the Hearing Officer’s credibility determinations control—I may not second-guess them—and the Court must accept the facts that he found if supported by substantial evidence. Leominster v. Stratton, supra, 58 Mass.App.Ct. at 728, 733.
The Hearing Officer’s findings of fact in this case were fully supported in the record. Those findings compelled his conclusion that because MassHealth never received a completed prior authorization request from an approved vendor, it could not, under the regulations, reimburse the plaintiff for acidophilus. The acidophilus decision is therefore AFFIRMED, though the plaintiff may submit—and MassHealth must consider and act upon—a new prior authorization request in conformity with the regulations.
ORDER FOR JUDGMENT
Final judgment shall enter, affirming (a) the Hearing Officer’s January 18, 2006 decision regarding Curcumin and (b) his April 4, 2006 decision regarding acidophilus, provided that the affirmance as to acidophilus is expressly without prejudice to the submission and consideration of a prior authorization request in conformity with MassHealth regulations governing prior approval of “durable medical equipment.”

 Federal law requires that a state medical assistance program which accepts Medicaid funds “provide for granting an opportunity for a fair hearing before the State agency to any individual whose clam for medica assistance under the plan is denied or is not acted upon with reasonable promptness.” 42 U.S.C. §1396a(a)(3); see 42 CFR 431.200. Massachusetts’ implementation of this requirement is found in G.L.c. 118E, §48 and 130 CMR 610.000 et seq.

MassHeath has conceded, repeatedly in the administrative record and in this appea, that it mishandled the piantiffs initia requests—-it should have acted on the Curcumin request, and the acidophilus request, which the Dmg Utilization Review Unit denied, should have been redirected to the Prior Authorization Unit because acidophilus is not a dmg. See below. This first hearing provides essentia procedura background for what was to come, but its outcome (which went, for the time being, in the plaintiffs favor) is not the subject of the present appea.

As Levy correctly pointed out, the web page in question appears to be posted as a resource regarding herba cancer remedies, but does not represent that Sloan-Kettering uses it with its own patients.

These are quotes from a treatise of some kind, submitted by the piantiff with her letter to the Hearing Officer dated May 31, 2005 (Hearing Exhibit 3). Review of materias submitted by the piantiff and also by MassHeath suggests that Curcumin is widely clamed to have anti-inflammatoxy, anti-carcinogenic, and other medicina properties, and that these claims are believed by some to be supported in both anima and human trias.

his was by fax of that date to Dr. Spanagel. The piantiff testified at the far hearing that Dr. Spanagel told her she never received the fax.

The hearing began with the plaintiffs request for an adjournment on the grounds that she was fatigued and did not have all of the evidence she needed. The Hearing Officer declined the request, but agreed to leave the record open until March 14 for the plaintiff to supplement the record, and until April 11 for MassHeath to respond. The piantiff mentions the denia of a continuance in an afidavit, but does not appear to press it as a ground for reversa. Whether or not to continue a hearing was a matter committed to hearing officer’s sound discretion. See Box Pond Assn. v. Energy Facilities Siting Bd., 435 Mass. 408, 413 (2001). There was no abuse of discretion here, particularly where the request was advanced ater the hearing had convened, with witnesses present.

The vendor is simply that—it could be CVS or wagreen’s; it is not necessarily the manufacturer of the product. There is no guarantee that the vendor will supply a particaar brand name, a matter of concern to the piantiff. The Vitamin Shop, where she obtans her Pure Encapsaations acidophilus, evidently is not a MassHealth-approved vendor.

At one point in his decision (p. 4, ¶¶8-9) the Hearing Officer suggested that there were two cals on this subject— one by the DUR Uat in December 2005 to “the piantiffs homeopathic doctor” and one by the PA Unit on December 22 to “the piantiffs physician." As I read the record, there was oay the second cai. The error was not materia to the outcome, however.

This is as permitted by federa law. See 42 U.S.C. §1396r-8(k)(4) (giving states the option of covering over-the-counter drugs if prescribed by a physician).

The Act’s deflation of a “covered outpatient drug” does not say what is a “drug,” but does reference extensively the Food, Drug and Cosmetic Act (“FDC Act”). The FDC Act’s deflation of a “drug” includes “articles intended for use in the diagnosis, cae, mitigation, treatment, or prevention of disease in man or other animas." 21 U.S.C. §321. The FDA has accordingly taken the position that Curcumin, when labeled or advertised as coaerring heath benefits on the consumer, is a “drug” under the FDC Act and must therefore be evauated by the FDA for safety and effectiveness. See Exhibit I to the Piantiffs Motion to Supplement the Administrative Record (specifically, the May 8, 2003 letter from the FDA’s Compliance Division to Herba Fields Supplements).

Also not at issue in this case is the question of whether naturopathic, homeopathic, and other treatment (apart from drugs) that is outside the mainstream of Western medicine are reimbursable by a Medicad-funded program. This appears to be one of those judgments that the Medicad Act commits to the states, which have taken divergent paths. For example, compare 7 AAC [Alaska Administrative Code] 105.110(17) (excluding coverage for “an aternative therapy or other service including acupuncture, homeopathic or na-turopathic remedy, or Ayurvedic medicine”), with 8 V.S.A. [Vermont Statutes Annotated] §4088d, as amended effective March 6, 2008 (providing that “[a] heath insurance plan shai provide coverage for medicaiy necessary heath care services covered by the plan when provided by a naturopathic physician licensed in this state ...” and including Medicaid and the Vermont Access Plan in the definition of “heath insurance plan”).

See fn. 5, supra.